# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

*** 

UNITED STATES OF AMERICA,

               Plaintiff,

vs.

JUSTIN BROWN,

               Defendant.

Case No. 2:17-cr-00058-JCM-VCF-1

**REPORT & RECOMMENDATION**

Before the Court are the following motions:

- Brown's Motion to Suppress Evidence Due to Fourth Amendment Violations (ECF No. 20), the Government's Response to Defendant's Motion to Suppress Evidence (ECF No. 21), and Brown's Reply (ECF No. 39).

- Brown's Motion to Dismiss or Suppress Evidence (ECF No. 36),[1] the Government's Response to Defendant's Motion to Dismiss or Suppress Evidence (ECF No. 45), and Brown's Reply (ECF No. 49).

The Court held an evidentiary hearing on August 3, 2017.  (*See* Mins. Proceedings (ECF No. 50)).

The indictment charges Defendant Justin Brown with possession of a firearm by a convicted felon in

violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2).  (*See* ECF No. 1).  The indictment arises from a January

29, 2017 search incident to arrest during which a firearm was found in a computer bag allegedly belonging

to Brown.  Brown argues that the search incident to arrest violated the Fourth Amendment, and that the

fruits of the search, including the firearm and the subsequent statements of Brown, should be suppressed.

---

[1] At the time Brown filed the original Motion to Suppress Evidence (ECF No. 20), he reserved the right to file a supplement to that motion once the Government produced certain body camera recordings relevant to the case. The Government subsequently produced body camera recordings. Brown's Motion to Dismiss or Suppress Evidence (ECF No. 36) is a supplement to his original Motion to Suppress Evidence (ECF No. 20) filed after receipt of those recordings.

Brown also argues that law enforcement's failure to record their entire encounter with Brown using Body Worn Cameras ("BWCs") violated Brown's due process rights and that the indictment should be dismissed. Alternatively, Brown argues that the Court should suppress the firearm and his statements as a sanction for failing to record the entire encounter with BWCs.

## I. INTRODUCTION

This case arises from law enforcement's discovery of a firearm during its investigation of a stolen vehicle. The Motion to Suppress Evidence Due to Fourth Amendment Violations (ECF No. 20) concerns a search incident to arrest, while the Motion to Dismiss or Suppress Evidence (ECF No. 36) relies on law enforcement's failure to record parts of their encounter with Brown using BWCs. The search incident to arrest violated the Fourth Amendment because Brown was secured in the back of a police vehicle at the time law enforcement officers searched his belongings, which were placed next to the stolen vehicle in the parking lot, well beyond Brown's reach. If the inevitable discovery doctrine did not apply here, the exclusionary rule would require the suppression of the firearm and statements. However, the firearm, but not Brown's statements, should be admitted under the inevitable discovery doctrine.

Law enforcement officers did not activate their BWCs at the appropriate times in accordance with law enforcement policies and procedures. They did not do so in bad faith, however. Law enforcement officers did not violate Brown's due process rights. Brown's Motion to Suppress (ECF No. 20) should be granted in part and denied in part. Brown's Motion to Dismiss or Suppress (ECF No. 36) should be denied.

## II. FACTUAL BACKGROUND

### A. Jamie Chittenden, Owner of the Stolen Vehicle and Person Reporting

On January 29, 2017, shortly before 8:00 p.m., Jamie Chittenden called 911 and reported that she had located her stolen vehicle, a 2005 tan-colored Nissan Altima. (*See* Mins. Proceedings (ECF No. 50)).

Chittenden testified that she previously loaned her vehicle to a friend, Tim, but a female had stolen the vehicle from Tim. (*See* Mins. Proceedings (ECF No. 50)). Chittenden called the Las Vegas Metropolitan Police Department ("Metro") and reported her vehicle stolen. (*Id*.). On the evening in question, Tim informed Chittenden that her stolen vehicle was presently located at 8471 West Sahara Avenue, Las Vegas, Nevada. (*Id*.). Chittenden and three of her friends drove to that address to see if they could get her vehicle back. (*Id*.).

Upon arriving, Chittenden observed her stolen vehicle parked in a shopping center parking lot near a Del Taco restaurant. (*Id*.). Chittenden called Metro. (*Id*.). A male and female were occupying the stolen vehicle—the female in the driver's seat and the male in the passenger seat. (*Id*.). Chittenden testified that she and her friends exited their vehicle and approached the stolen vehicle. (*Id*.). While Chittenden was on the phone with Metro, her friends confronted the male and female occupants about the stolen vehicle. (*Id*.). A ruckus ensued. (*Id*.).

The female occupant immediately left the scene and walked to a Smith's grocery store. (*Id*.). Chittenden observed multiple bags, boxes, and suitcases packed inside her vehicle, none of which belonged to her. (*Id*.). The male began anxiously taking the personal property out of the stolen vehicle and placing the items on the parking lot, just outside the passenger side of the vehicle. (*Id*.). The male occupant pleaded with Chittenden not to call the police. (*Id*.). Metro Officers arrived shortly after Chittenden's 911 call. (*Id*.).

Once Metro arrived on the scene, Chittenden testified that a Metro Officer called the male, Defendant Justin Brown, over to his police vehicle. (*Id*.). Chittenden testified that Brown was separated from the stolen vehicle and the belongings next to the stolen vehicle. (*Id*.). Chittenden testified that she and her friends were at the scene throughout the incident. (*Id*.). Chittenden observed Metro Officers' search of the bags and suitcases outside the stolen vehicle. (*Id*.). On cross examination, however,

Chittenden testified that she did not observe all of the search because she was speaking with other Metro Officers during this time. (*See* Mins. Proceedings (ECF No. 50)). Chittenden testified that she did not recall Metro Officers finding a firearm during the search. (*Id*.). She also testified that she did not recall Brown's location in relation to the firearm during the search. (*Id*.).

## B. Gabriel Lebario, Metro Officer

Metro Officer Gabriel Lebario was working as a patrol officer on January 29, 2017, and responded to dispatch's notification of the call from Chittenden. (*Id*.). Officer Lebario testified that he was the first officer to arrive at the scene. (*Id*.). Metro Officer Bradley Roberts and Ruben Rodriguez arrived shortly after him. Officer Lebario observed a vehicle matching the 911 caller's description in the shopping center parking lot. (*Id*.). A group of individuals were standing near the Nissan Altima. (*Id*.). The group directed Officer Lebario to one particular individual, Brown. (*Id*.). Officer Lebario observed Brown on the passenger side of the vehicle gathering property from the vehicle and placing it on the parking lot next to the vehicle. (*Id*.).

Officer Lebario testified that he exited his patrol vehicle and called Brown over to the front of his vehicle. (*Id*.). He performed a pat down search of Brown for weapons and contraband. (*Id*.). Officer Lebario testified that Brown stated that a female was driving the stolen vehicle. (*Id*.). Brown gave Officer Lebario a description of the female. (*Id*.). Officer Lebario testified that because of the serious and ongoing nature of the crime involved, and to investigate further, he handcuffed Brown and placed him in the back of his patrol vehicle. (*Id*.). Brown was not under arrest, only detained pending further investigation. (*Id*.). Officer Lebario did not recall locking the doors to his patrol vehicle, but on cross examination Officer Lebario stated that with the group of individuals around the stolen vehicle and few, if any, Metro Officers present to watch the detained suspect, he would likely have locked the suspect in the back of the vehicle. (*Id*.). Officer Lebario's body camera footage shows him placing a handcuffed Brown in the back of his

patrol vehicle because he "can't keep an eye on [Brown] and get the story." (*See* Defendant's Exhibit A, no. 5849 Pt. 1 of 2, at 7:40-8:00). It also appears to show Officer Lebario activate the locking mechanism for the vehicle doors. (*Id*. at 8:10-15).

With Brown secured, Officer Lebario proceeded to investigate further. (*See* Mins. Proceedings (ECF No. 50)). At this time, other Metro Officers began to arrive, including Metro Officers Ruben Rodriguez and Bradley Roberts. (*Id*.). Officer Lebario testified that Officer Rodriguez and Officer Roberts ran a records check on Brown. (*Id*.). The records check showed that Brown had an outstanding warrant for failure to yield, a traffic offense. (*Id*.). The records check also revealed that Brown was a registered felon for convictions in 2013 for assault with a deadly weapon and in 2014 for possession of a firearm by an ex-felon. (*Id*.). Officer Lebario testified that at this time Metro Officers had apprehended the female suspect at a nearby Smith's grocery store and were not looking at Brown to charge with possession of the stolen vehicle. (*Id*.). Metro Officers placed Brown under arrest, however, for the warrant. (*Id*.).

Officer Lebario testified that when he decided to arrest Brown for the warrant, Brown was secured in the back of his patrol vehicle, which was parked about 15-20 feet from the stolen vehicle and the belongings next to it. (*Id*.). It was not possible for Brown to reach the bags next to the stolen vehicle. (*Id*.). After Officer Lebario placed Brown under arrest for the warrant, Officer Roberts informed Officer Lebario that he had located a firearm in one of the bags next to the stolen vehicle. (*Id*.). Once Officer Lebario learned of the firearm, he testified that "now it changes the game a little bit" in light of Brown's prior felony convictions. (*Id*.). Officer Lebario testified that he then mirandized Brown and advised him of his rights. (*Id*.). On cross examination, however, Officer Lebario testified that he in fact mirandized Brown much earlier—almost immediately after he arrived on the scene. (*Id*.). Footage from Officer Lebario's BWC shows that shortly after Officer Lebario arrived on the scene he performed a quick pat

down search of Brown and then mirandized him. (*See* Defendant's Exhibit A, no. 5849 Pt. 1 of 2, at 2:30-55).

Officer Lebario testified that he asked Brown about the firearm found in one of the bags adjacent to the stolen vehicle. (*See* Mins. Proceedings (ECF No. 50)). Initially Brown stated that it was not his firearm, but after Officer Lebario asked Brown if Brown's DNA would be found on the firearm or any part of it, Brown stated to Officer Lebario that he handled the firearm and that his DNA would be located on the firearm. (*Id*.). Officer Lebario testified that Officer Roberts and Officer Rodriguez placed Brown under arrest for felony possession of a firearm. (*Id*.). Officer Lebario testified that he did not impound the firearm. (*Id*.). A crime scene analyst called to the scene had taken custody of the firearm and impounded it. (*Id*.).

Officer Lebario testified that he conducted an inventory search of the stolen vehicle and the bags and luggage next it because Metro intended to release the vehicle back to its owner, Chittenden, that same evening. (*Id*.). Officer Lebario gathered the bags and luggage lying in the parking lot adjacent to the passenger side of the stolen vehicle, none of which belonged to Chittenden, and brought the property to a Metro substation. (*Id*.). Officer Lebario testified that the purpose of an inventory search is to document or inventory the property and to prepare it to be placed into the evidence vault. (*Id*.). Officer Lebario testified that he searched every bag in accordance with Metro policies and procedures. (*See id*.; *see also* Defendant's Exhibit B, no. 5849 Pt. 2 of 2). Officer Lebario testified that under Metro policies and procedures, he was required to search and itemize each item of property, including closed bags. (*Id*.). Officer Lebario testified that as part of impounding and inventorying a person's property, Metro policies and procedures required him to complete a property report document. (*Id*.). That document required Officer Lebario to input information about each item of property impounded. (*See id*.; *see also* Government's Exhibit 2). On cross examination, Officer Lebario testified that Metro Officers are trained

to provide a detailed description of the property, but he only used general terms on the property report to describe Brown's belongings. (*See* Mins. Proceedings (ECF No. 50); *see also* Government's Exhibit 2). Officer Lebario testified that after itemizing a person's property on the Metro property report, Metro policies and procedures required him to then transport the property back to the Metro station and place the property in an evidence vault for safekeeping. (*Id.*).

Officer Lebario testified that he had worn a BWC on January 29, 2017. (*Id.*). Officer Lebario had been operating a BWC for 2-3 weeks up to that point. (*Id.*). Officer Lebario testified that before he first began using a BWC, he received training on operating a BWC and reviewed Metro's policy on BWCs. (*Id.*). Officer Lebario testified that based on his understanding of Metro's BWC policy, Officers are required to active their BWCs when responding to a service call, but do not need to continuously operate the BWC throughout an event. (*Id.*). Officer Lebario testified that he activated his BWC shortly after he came into contact with Brown. (*Id.*). Officer Lebario activated and deactivated his BWC throughout the event. (*Id.*). Officer Lebario agreed that an important reason for BWCs is to record Metro Officers' interactions with defendants. (*Id.*). Officer Lebario testified that he did not activate his camera at the appropriate times on January 29, 2017. (*Id.*).

## C. Bradley Roberts, Metro Officer

Officer Bradley Roberts testified that he and Officer Rodriguez arrived at the scene shortly after Officer Lebario. (*Id.*). Officer Roberts was a field training officer tasked with training Officer Rodriguez. (*Id.*). Upon his arrival, Officer Roberts observed Officer Lebario with Brown in front of Officer Lebario's patrol vehicle. (*Id.*). Brown was detained in handcuffs. (*Id.*). Officer Roberts observed a pile of luggage and bags on the floor just outside the passenger side of the stolen vehicle. (*Id.*). Officer Roberts testified that because Officer Lebario had already detained Brown, Officer Rodriguez went and obtained Brown's personal information and started running Brown's information through Metro's record check system. (*See*

Mins. Proceedings (ECF No. 50)).  On cross examination, however, Officer Roberts testified that Officer Rodriguez first sought to obtain witness statements and, once that was completed, Officer Rodriguez ran a records check on Brown.  (*Id.*).  Footage from Officer Roberts's BWC shows Officer Lebario informing Officer Roberts and Officer Rodriguez of the situation when they arrived and requesting that Officer Roberts and Officer Rodriguez speak with and obtain voluntary statements from witnesses.  (*See* Defendant's Exhibit B, no. 9080 Pt. 1 of 1, at 1:05-30).  After running the records check, Officer Rodriguez informed Officer Roberts that Brown had a warrant for his arrest and that Brown was an ex-felon.  (*See* Mins. Proceedings (ECF No. 50)).

After learning of Brown's warrant, Brown was placed under arrest.  (*Id.*).  Officer Roberts testified that based on conversations between Brown and Officer Lebario, and other witness statements, the bags and luggage Brown had been observed taking out of the stolen vehicle and placing on the parking lot floor was his property.  (*Id.*).  At this time, Officer Roberts decided to conduct a search incident to arrest of those bags and luggage.  (*Id.*).  At the time of the search, Officer Roberts testified that Brown was inside Officer Lebario's patrol vehicle.  (*Id.*).  While Officer Roberts was searching a computer bag located in the pile of other bags and luggage placed just outside the passenger side of the stolen vehicle, he found a firearm.  (*Id.*).  Officer Roberts testified that he immediately took the bag with the firearm over to his patrol car and showed Officer Rodriguez, who was busy doing paperwork.  (*Id.*).  Officer Roberts testified that he removed the bag containing the firearm from the pile of bags and luggage because of safety concerns.  (*Id.*).  Officer Roberts testified that because Brown was an ex-felon and that the bag containing the firearm was believed to be his property, Metro changed the focus of their investigation to an ex-felon in possession of a firearm.  (*Id.*).  Officer Roberts placed the bag containing the firearm in his patrol vehicle for safe keeping and then informed Officer Lebario about the firearm.  (*Id.*).

Officer Roberts testified that he did not impound the firearm. (*See* Mins. Proceedings (ECF No. 50)). An "ID tech" came to the scene to photograph and impound the firearm. (*Id*.). Officer Roberts testified that the rest of the bags and luggage were impounded by Officer Lebario because Clark County Detention Center ("CCDC") does not accept large amounts of property. (*Id*.). Officer Roberts testified that when an Officer impounds a person's property, Metro policies and procedures requires that Officer to document everything as part of the inventory search. (*Id*.). Officer Roberts testified that he was only at the scene for 20 minutes. (*Id*.). During that time, he did not interact with Brown until he and Officer Rodriguez transported Brown to CCDC. (*Id*.). But Officer Roberts did not recall any statements that Brown made. (*Id*.).

Officer Roberts testified that January 29, 2017 was the third day he had been using the BWC. (*Id*.). Before using the BWC, Officer Roberts had received training on operating the BWC and reviewed Metro's policies and procedures on BWCs. (*Id*.). On the evening in question, Officer Roberts activated his BWC when Metro dispatched him to the scene. (*Id*.). Shortly after arriving, Officer Roberts turned off his BWC stating "camera off dude, to discuss call." (*Id*.). Officer Roberts testified that Metro policy allowed him to deactivate his BWC because he was discussing investigative information with other Metro Officers. (*Id*.). Officer Roberts testified that based on his understanding of Metro policy, after speaking with the other Metro Officers, he was required to, but did not activate his BWC. (*Id*.). After Officer Roberts deactivated his BWC, Officer Rodriguez informed him of Brown's warrant. (*Id*.). Officer Roberts then searched Brown's bags and luggage. (*Id*.).

### D. Ruben Rodriguez, Metro Officer

Metro Officer Ruben Rodriguez also testified at the hearing. (*Id*.). On January 29, 2017, Officer Rodriguez was in field training and being supervised and trained by Officer Roberts. (*Id*.). Upon arriving at the scene of the stolen vehicle, Officer Rodriguez observed Officer Lebario speaking with Brown at the

front of Officer Lebario's patrol vehicle. (*See* Mins. Proceedings (ECF No. 50)). Officer Rodriguez testified that he spoke with Officer Lebario about the situation and what he could do to assist. (*Id*.). Officer Lebario asked Officer Rodriguez to speak with the 911 caller and other witnesses and obtain their statements. (*Id*.). Officer Rodriguez testified that he first made contact with Chittenden and other witnesses to gather and authenticate their information and obtain voluntary witness statements. (*Id*.). On cross examination, Officer Rodriguez testified that he first obtained completed witness statements and then ran the records check on Brown. (*Id*.). On redirect examination, Officer Rodriguez testified that he first started speaking with and obtaining witness statements, and while the witnesses were drafting voluntary statements, he was able to run a records check on Brown. (*Id*.).

Officer Rodriguez testified that he ran a records check on Brown through the Metro database and learned that Brown had a Municipal Court warrant and two prior convictions for assault with a deadly weapon and for possession of a firearm by an ex-felon. (*Id*.). Officer Rodriguez promptly notified Officer Roberts and Officer Lebario of this information. (*Id*.). Officer Rodriguez testified that Officer Lebario made the decision to arrest Brown for the warrant. (*Id*.).

Officer Roberts then conducted a search incident to arrest of the bags and luggage in the parking lot adjacent to the passenger side of the stolen vehicle. (*Id*.). Officer Rodriguez testified that at the time of Officer Roberts's search, Brown was about 20 feet away, handcuffed, and in the back of Officer Lebario's patrol vehicle. (*Id*.). Officer Rodriguez testified that Officer Roberts informed him about a firearm that Officer Roberts found in a computer bag stacked among the pile of bags and luggage. (*Id*.). Officer Rodriguez testified that at some point, the discovery of the firearm was communicated to Officer Lebario. (*Id*.). Officer Rodriguez did not observe Officer Roberts's search and discovery of the firearm. (*Id*.). Officer Rodriguez testified that Officer Roberts showed him the firearm in the computer bag. (*Id*.). Officer Roberts brought the bag containing the firearm to his patrol vehicle and using latex gloves, he and

Officer Rodriguez confirmed the authenticity of the firearm. (*See* Mins. Proceedings (ECF No. 50)). Officer Rodriguez testified that he and Officer Roberts contacted a Metro crime scene analyst who processed and impounded the firearm. (*Id*.). Officer Rodriguez testified that because Brown was an ex-felon, he was arrested and charged with ex-felon possession of a firearm. (*Id*.).

Officer Rodriguez testified that he and Officer Roberts transported Brown to CCDC. (*Id*.). Officer Rodriguez did not impound the multiple bags and luggage next to the stolen vehicle because the CCDC would not accept significant amounts of personal possessions for storage. (*Id*.). The bags and luggage were impounded by another officer. (*Id*.).

Officer Rodriguez testified that he was wearing a BWC on January 29, 2017. (*Id*.). Officer Rodriguez testified that he had been working as an Officer in training for 3 months as of January 29, 2017. (*Id*.). Prior to that date, Officer Rodriguez was trained on how to operate the BWC and had reviewed Metro's policy and procedures on BWCs. (*Id*.). Officer Rodriguez arrived at the scene at 8:00 p.m. and left at 8:20 p.m. (*Id*.). Officer Rodriguez activated his BWC when he arrived on the scene and made contact with the witnesses, but turned it off during the incident, including when he ran the records check on Brown. (*Id*.).

Metro has written policies and procedures dealing with the use of BWCs. Section 5/210.01 of the policy manual states in pertinent part as follows:

> Officers will activate the [Body Worn Camera] when such use is appropriate to the proper performance of duties, where the recordings are consistent with this policy and law, and as soon as practical and safe, to record. Officers will record all contacts with citizens in the following occurrences:
>
> 1. Vehicle stops;
> 2. Person stops: consensual, articulable reasonable suspicion, or probable cause;
> 3. All dispatched calls for service involving contact with citizens;
> 4. Detentions, investigations pursuant of an arrest, arrests, suspect interviews, and post-Miranda interrogations;

5. Search of persons incident to arrest (if not already activated);
6. Search of warrants of structures or vehicles;
7. K9 searches requested by a Patrol Officer;
8. As soon as possible after the occurrence of an officer-involved traffic accident (if not already activated);
9. Code 3 driving;
10. Pursuits: primary and secondary officers;
11. Any contact that becomes adversarial when body camera had not been activated;
12. Transport of Code 5 prisoners;
13. Any other citizen contact or official duty circumstance at the officer's discretion based on circumstances and reasonableness (e.g. field testing of narcotics, counting of seized money in the field, documenting high-value found property).
…

Once the [Body Worn Camera] is activated, recording will continue until the event has concluded; the following are exceptions:
…
6. The officer determines that the recording must be stopped, either temporarily or for the duration of the event, based on clearly articulable reasons (e.g. to discuss sensitive intelligence or investigative information);
…

Officers shall continue recording until they announce on camera that they are deactivating their [Body Worn Camera]. These instances are:

    Under the exceptions above. Officers must state the specific reason(s) they are turning off their cameras before doing so;
…

*See* Defendant's Exhibit C, p. 2-4.

On February 21, 2017, a federal grand jury returned a one-count indictment against Brown, charging him with felon in possession of a firearm under 18 U.S.C. §§ 922(g)(1), 924(a)(2). (*See* ECF No. 1). On May 1, 2017, Brown filed a Motion to Suppress Evidence Due to Fourth Amendment Violations to suppress the firearm and his statements because (1) Metro Officers conducted an improper search incident to arrest; and (2) the body camera recordings produced by the Government do not confirm

that Metro Officers followed the standard procedures of the local police department when conducting the inventory search.

On June 14, 2017, after receiving additional body camera recordings of the event, Brown supplemented his original Motion to Suppress Evidence by filing a Motion to (1) dismiss Brown's indictment because Metro violated his due process rights by not recording the entire encounter with Brown using their BWCs and (2) to suppress the firearm and Brown's statements as a sanction for failing to collect evidence.

## III. DISCUSSION

### A. Motion to Suppress Evidence Due to Fourth Amendment Violations (ECF No. 20)

#### a. Applicable Law and Legal Standards

The Fourth Amendment makes warrantless searches and seizures *per se* unreasonable—subject only to a few specifically established and well delineated exceptions. (*See United States v. Cervantes*, 703 F.3d 1135, 1138-39 (9th Cir. 2012) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967))). These exceptions include, among others, a search incident to a lawful arrest. (*See Arizona v. Gant*, 556 U.S. 332, 338 (2009)).

The "search-incident-to-arrest" exception allows a police officer "who makes a lawful arrest" to search the "arrestee's person and the area 'within [the arrestee's] immediate control.'" (*See Davis v. United States*, 564 U.S. 229, 232 (2011) (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969))). In the current case, Defendant Brown seeks to suppress evidence discovered by an officer searching a computer bag far removed from Brown's immediate control. The area "within [an arrestee's] immediate control" is defined as "the area from within which [an arrestee] might gain possession of a weapon or destructible evidence." (*See Chimel*, 395 U.S. at 763). The "immediate control" requirement "ensures that the scope of a search incident to arrest is commensurate with its purposes of protecting arresting

13

officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy." (*See Gant*, 556 U.S. at 339).[2]

If there is "no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception"—finding weapons the arrestee might use, or evidence the arrestee might conceal or destroy—are "absent and the rule does not apply." (*Id.*). The focus is on an arrestee's "ability (or inability) to access weapons or destroy evidence at the time a search incident to arrest is conducted." (*See United States v. Shakir*, 616 F.3d 315, 318 (3d Cir. 2010); *see also Gant*, 556 U.S. at 339; 3 Wayne R. Lafave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 5.5(a), at 296 (5th ed. 2012) ("[T]his 'possibility of access' must be judged as of 'the time of the search,' rather than at some earlier point, and that such access is deemed possible only 'when the arrestee is unsecured and within reaching distance.'")).

In addition to examining whether the area searched was within an arrestee's "immediate control," courts must evaluate whether any event occurred after the arrest that rendered the search unreasonable. (*See United States v. Cook*, 808 F.3d 1195, 1199 (9th Cir. 2015) (citing *United States v. Maddox*, 614 F.3d 1046, 1048 (9th Cir. 2010))). While "[t]here is no fixed outer limit for the number of minutes that may pass between an arrest and a valid, warrantless search," the Ninth Circuit has held that the search must be "spatially and temporally incident to the arrest." (*See id.* (quoting *United States v. Camou*, 773 F.3d 932, 937 (9th Cir. 2014)); *see also United States v. Caseres*, 533 F.3d 1064, 1073 (9th Cir. 2008) ("[T]he relevant focus is 'not strictly on the timing of the search but its relationship to (and reasonableness in light of) the circumstances of the arrest.'" (quoting *United States v. Smith*, 389 F.3d 944, 951 (9th Cir. 2004)))).

---

[2] The Ninth Circuit has construed *Gant's* holding as applicable to searches outside the automobile context because the *Gant* Court "tethered its rationale to the concerns articulated in *Chimel*, which involved a search of an arrestee's home." (*See United States v. Cook*, 808 F.3d 1195, 1199, n.1 (9th Cir. 2015)).

To summarize, the determination of the validity of a search incident to arrest in the Ninth Circuit is a twofold inquiry: (1) "was the searched item within the arrestee's immediate control when he was arrested"; and (2) "did events occurring after the arrest but before the search ma[k]e the search unreasonable?" (*See Maddox*, 614 F.3d at 1048 (quoting *United States v. Turner*, 926 F.2d 883, 887 (9th Cir. 1991))). The Government has the burden to show—by a preponderance of the evidence—that a warrantless search falls within an exception to the warrant requirement. (*See United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012) (citation omitted)).

### b. The Search Incident to Arrest Violated the Fourth Amendment

In the instant motion to suppress, Defendant Brown asks this Court to suppress "the Ruger .40 caliber handgun and his statements" because Metro Officers allegedly conducted an improper search incident to arrest, violating Brown's Fourth Amendment Rights. (*See* ECF Nos. 20 at 5; 39 at 3-4). Relying on *United States v. Cook*, 808 F.3d 1195 (9th Cir. 2015), the Government argues that Brown had immediate control over his bags when Metro Officers showed up to investigate. (*See* ECF No. 21 at 4). Even though he was arrested and placed in handcuffs, the Government claims that the "bags were still potentially within his reach." (*See* ECF No. 21 at 4). Brown relies on *Arizona v. Gant*, 556 U.S. 332 (2009), and argues that he did not have immediate control of the bag at the time of the search because he was handcuffed in the patrol car. (*See* ECF Nos. 20 at 5; 39 at 3).

The Court begins with a brief review of the U.S. Supreme Court's decision in *Arizona v. Gant* and the Ninth Circuit's decision in *United States v. Cook*. In *Gant*, the defendant was arrested for driving on a suspended license. (*See Gant*, 556 U.S. at 335). Police officers placed the defendant in handcuffs and secured him in the back of a patrol car before conducting a search of his car. (*Id*. at 336). The search led to the discovery of a gun and a bag of cocaine in the pocket of a jacket on the backseat. (*Id*.). The U.S. Supreme Court held that the search was unconstitutional because (1) the defendant could not have

accessed his car to retrieve weapons or evidence at the time of the search because he was already handcuffed and locked inside the police car, and thus, there was no concern for officer safety; and (2) there was no basis for officers to believe there was evidence relating to the crime of driving on a suspended license that needed to be preserved. (*See Gant*, 556 U.S. at 343-44).

In *Cook*, undercover DEA agents arranged to buy narcotics from two individuals, Lambert and Edmonds. (*See Cook*, 808 F.3d at 1197). While agents were surveilling Lambert's house shortly before the scheduled drug sale, they saw defendant Cook carry a backpack into the house. (*Id*.). When Cook left a short time later, his backpack appeared less full and lighter, leading agents to conclude that Cook likely dropped something off while inside the house. (*Id*.). Shortly after Cook left, Lambert and Edmonds exited the house and headed to the location where the drug deal was to take place. (*Id*.). Lambert and Edmonds were arrested after they attempted to sell drugs to an undercover DEA agent. (*Id*.). Agents took Edmonds back to Lambert's House where they found two firearms. (*Id*.). In addition, Edmonds identified Cook as his drug supplier. (*Id*.). At the agents' direction, Edmonds placed a monitored call to Cook that the drugs had been sold. (*Id*.). Cook arrived shortly thereafter wearing the same backpack. (*Id*.). When Cook exited his car, he began approaching Lambert's house when the agents ordered him to the ground at gunpoint. (*Id*.). While lying face down on the ground, agents cuffed Cook's hands behind his back. (*Id*.). Officer Knight came onto the scene. (*Id*.). By this time, a crowd had gathered making agents uneasy: they wanted to move out of the area. (*Id*.). While Cook was still on the ground and within one or two minutes of his arrest, Officer Knight picked up Cook's backpack, which was right next to him, and conducted a 20 or 30 second search for weapons. (*Id*.). Finding none, agents then moved Cook and his backpack to a safe location. (*Id*.). After conducting a more thorough search of the backpack, agents found narcotics. (*Id*.).

Under the totality of the circumstances, the Ninth Circuit found that the search of Cook's backpack was reasonable and valid incident to arrest. (*See Cook*, 808 F.3d at 1200). The Court acknowledged that Cook's position at the time of the search—face down on the ground with his hands cuffed behind his back—was an important factor to consider. (*Id*. at 1199). But the Court reasoned that the search, both quick and cursory, was "spatially and temporally incident to the arrest." (*Id*. at 1199-1200). The search occurred immediately after Cook was arrested. (*Id*. at 1200). Cook's backpack was right next to him and easily within "reaching distance." (*Id*.). And, within 20 to 30 seconds, as soon as Officer Knight determined that the backpack contained no weapons, he immediately stopped the search. (*Id*.). The Ninth Circuit determined that the brief and limited nature of the search, its immediacy to the time of arrest, and the location of the backpack ensured that the search was "commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that [Cook] might conceal or destroy." (*Id*. (quoting *Gant*, 556 U.S. at 339)). The Court also found the agents' safety concerns to be objectively reasonable because Cook likely used the same backpack he used earlier in the day to transport drugs to and from Lambert's house where two firearms were recovered and a crowd had gathered in front of the same house. (*Id*.).

The Court has reviewed the body camera footage, arrest report, and other such evidence submitted, and considered testimony at the evidentiary hearing. The Court finds that Metro's search incident to arrest violated the Fourth Amendment. Officer Lebario was the first Officer to arrive on the scene. After encountering Brown, Officer Lebario placed Brown in handcuffs and performed a pat down search for weapons. To investigate further, Officer Lebario placed Brown in his patrol vehicle, which was parked 15 to 20 feet away from the stolen vehicle and adjacent bags and luggage, and locked its doors. Brown remained there until he was transported from the scene.

To determine the validity of a search incident to arrest under Ninth Circuit law, the Court must first inquire whether the searched item was within Brown's immediate control when he was arrested. When Metro Officers decided to arrest Brown after discovering the warrant, Brown was still handcuffed and secured in the patrol vehicle. When Officer Roberts conducted a search incident to arrest and discovered the firearm, the searched items were not within Brown's immediate control. Brown could not have reached into the area—i.e., the bags, boxes, and luggage he had earlier placed in the parking lot next to the stolen vehicle—where Metro Officers searched. The justifications for the search incident to arrest exception are to protect arresting officers and safeguard evidence that an arrestee might conceal or destroy. Both were absent here. So, the search incident to arrest exception does not apply. (*See Gant*, 556 U.S. at 339).

If a police officer violates the Fourth Amendment, the Government may not introduce evidence of a crime that is the "fruit" of an unlawful search. (*See Wong Sun v. United States*, 371 U.S. 471, 484 (1963)). The exclusionary rule is a judge-made rule that penalizes police misconduct. (*See Spano v. New York*, 360 U.S. 315, 320-21 (1959) ("[T]he police must obey the law while enforcing the law; [ ] in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.")). It applies to direct products of an illegal search— i.e., the physical evidence found during the search itself—and to indirect products of the illegal search— i.e., statements or physical evidence subsequently obtained in part as a result of the search—if they "bear a sufficiently close relationship to the underlying illegality." (*See United States v. Shetler*, 665 F.3d 1150, 1157 (9th Cir. 2011)*; see also Murray v. United States*, 487 U.S. 533, 536 (1988)).

### c. The Inevitable Discovery Doctrine Should Apply

Because the search incident to arrest violated the Fourth Amendment, the Court must address whether evidence of the firearm and Brown's incriminating statements should be suppressed from the

Government's case in chief. The Government argues that, even if the Court finds that the search incident to arrest was unconstitutional, the firearm and Brown's statements are admissible under the inevitable discovery doctrine. For the reasons stated below, the Court agrees that the firearm should be admissible under the inevitable discovery doctrine, but not Brown's statements.

When deciding whether the exclusionary rule should be applied, the Court must inquire whether the incriminating evidence was discovered as a result of a law enforcement officer's illegal act or "by means sufficiently distinguishable to be purged of the primary taint." (*See United States v. Davis*, 332 F.3d 1163, 1170-71 (9th Cir. 2003) (quoting *Wong Sun*, 371 U.S. at 488)). Evidence is sufficiently purged of the primary taint if (1) there is an independent source for its discovery, (2) it would have inevitably been discovered, or (3) the discovery is sufficiently attenuated from the illegal act. (*See Davis*, 332 F.3d at 1170-71 (citing *United States v. Smith*, 155 F.3d 1051, 1060 (9th Cir. 1998))).[3]

Under the inevitable discovery doctrine, if, "by following routine procedures, the police would inevitably have uncovered the evidence, then the evidence will not be suppressed despite any constitutional violation." (*See United States v. Young*, 573 F.3d 711, 721 (2009) (internal quotation marks and citation omitted); *see also Illinois v. Lafayette*, 462 U.S. 648 (1983) (holding that it is not "unreasonable for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures."); *United States v. Andrade*, 784 F.2d 1431, 1433, n.3 (9th Cir. 1986) (holding that the inevitable discovery doctrine "requires only that the government show the evidence *would have been discovered* inevitably by *lawful means*.") (emphasis in original); 3 Lafave, *supra*, § 5.5(b), at 301-02 ("[W]henever the defendant's suitcase or some similar container was properly impounded by the police at the time of his arrest …, an

---

[3] Because the Government does not argue that the independent source and attenuated basis exceptions are relevant here, the Court discusses only the inevitable discovery exception.

item-by-item inventory of its contents at the station is permissible.")).  The Government must show by a preponderance of the evidence that the contraband or other material seized would have been discovered inevitably by lawful means.  (*See United States v. Reilly*, 224 F.3d 986, 994 (9th Cir. 2000)).

The Court finds that the Government has met its burden here and properly showed that the firearm would have been discovered inevitably through lawful inventory procedures.  Metro arrested Brown for an outstanding warrant.  The lawfulness of that arrest is not in dispute.  Indeed, once Metro Officers discovered the warrant, they were obligated to arrest Brown.  (*See United States v. Leon*, 468 U.S. 897, 920, n.21 (1984) ("A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions.") (internal quotation marks omitted)).

As part of the routine procedures incident to incarcerating an arrested person, police officers may search belongings in the arrestee's possession.  (*See Colorado v. Bertine*, 479 U.S. 367, 372 (1987) ("[I]nventory procedures serve [1] to protect an owner's property while it is in the custody of the police, [2] to insure against claims of lost, stolen, or vandalized property, and [3] to guard the police from danger.")).  Once Metro arrested Brown for an outstanding warrant, they could not leave the bags and luggage allegedly belonging to Brown in the shopping center parking lot.  Metro Officers were obligated to safeguard Brown's belongings and, to that end, needed to inventory the contents of the bags, to protect themselves against any claims of property loss or damage.

Based on conversations between Brown and Officer Lebario, and statements from witnesses at the scene of the stolen vehicle, Metro Officers concluded that the bags and luggage Brown had been observed removing from the stolen vehicle and placing in the parking lot next to the passenger side of the stolen vehicle, was his property.  Officer Roberts found the firearm in a computer bag located in that pile of bags and luggage.  Officer Roberts took the bag with the firearm over to his patrol car because of safety concerns.  After Metro Officers confirmed the firearm was real, they contacted a crime scene analyst who

came to the scene to photograph and impound the firearm. The rest of the bags and luggage were impounded by Officer Lebario because CCDC would not accept large amounts of property for storage. The Government did not provide the Court with a written copy of Metro's inventory policies and procedures. But Metro Officers testified at the evidentiary hearing about Metro's policies and procedures for impounding and conducting an inventory search of a person's property.

Officer Lebario conducted the inventory search of the stolen vehicle and the bags and luggage next it because Metro intended to release the vehicle back to its owner that evening. Officer Lebario brought the bags and luggage lying in the parking lot adjacent to the passenger side of the stolen vehicle to a Metro substation. Officer Lebario testified that the purpose of an inventory search is to document or inventory the property and to prepare it to be placed into the evidence vault. To that end, Officer Lebario itemized and searched the bags and luggage in accordance with Metro policies and procedures. Officer Lebario completed a property report document. (*See* Government's Exhibit 2). Officer Lebario testified that he was trained to provide a detailed description of the property, but used general terms on the property report to describe Brown's belongings. After itemizing and searching the bags and luggage, Officer Lebario transported the property to a Metro station and placed it in an evidence vault for safekeeping.

Brown's transfer to CCDC for processing was inevitable, as was the search of his belongings, including the computer bag containing the firearm. The routine booking procedure and inventory would have inevitably resulted in discovery of the firearm. Because it was normal Metro procedure to inventory an arrestee's possessions, including bags and luggage, at the time of booking, the Government has shown that by preponderance of the evidence the firearm would have been inevitably discovered. Thus, the firearm should be admitted under the inevitable discovery doctrine as an exception to the exclusionary rule.

The Court must also consider whether the incriminating statements Brown made to Officer Lebario should be suppressed as "fruits of the poisonous tree" because they were sufficiently connected to the preceding illegal search. (*See Wong Sun*, 371 U.S. at 488; *see also* 6 Lafave, *supra*, § 11.4(c), at 399-400 ("where the defendant was present when incriminating evidence was found in an illegal search or was confronted by the police with incriminating evidence they had illegally seized earlier, it is apparent that there has been an "exploitation of that illegality" when the police subsequently question the defendant about that evidence or the crime to which it relates.")). The standard articulated in *Wong Sun* remains the relevant test. As previously explained, the question in such a case is "whether, granting establishment of the primary illegality, the evidence to which [the] instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." (*Id.* (citation omitted)).

The first inquiry is whether the statements were the product of the illegal search; if they were, the Court must then ask whether the statements were nevertheless so attenuated from the search that suppression was not warranted. (*See United States v. Shetler*, 665 F.3d 1150, 1157 (9th Cir. 2011)). The Government must show that the statements were not obtained illegally. (*Id.*). In other words, "[i]t is the government's burden to show that evidence is not 'fruit of the poisonous tree.'" (*Id.* (quoting *United States v. Twilley*, 222 F.3d 1092, 1097 (9th Cir.2000))).

The Court finds that the Government did not meet its burden to show that Brown's statements were not the product of the illegal search. This conclusion is supported by *United States v. Nora*, 765 F.3d 1049 (9th Cir. 2014) and *United States v. Shetler*, 665 F.3d 1150 (9th Cir. 2011). There, the Ninth Circuit suppressed incriminating statements because law enforcement officers used evidence gleaned from an illegal search in questioning the suspect. (*See Nora*, 765 F.3d at 1057; *see also Shetler*, 665 F.3d at 1158). In both cases, the Ninth Circuit held that suppression was warranted because the defendants'

statements were likely "influenced by [their] knowledge that the officials had already seized certain evidence." (*See Nora*, 765 F.3d at 1057).

The same is true here. Brown's incriminating statements followed immediately "on the heels" of the unlawful search incident to arrest of the bags and luggage adjacent to the stolen vehicle, which yielded the firearm. Under the circumstances, it cannot be doubted that the search of Brown's bags and luggage led directly to his incriminating statements. In the absence of the improper search, Metro would have known nothing about the firearm and would thus have had no occasion to question Brown about its possession, at least until Officer Lebario conducted an inventory search of the bags and luggage. When Brown made statements about possessing the firearm, Metro Officers had already discovered that he was previously convicted for, *inter alia*, ex-felon possession of a firearm. A reasonable person would believe that remaining silent would be futile under these circumstances. (*See Shetler*, 665 F.3d at 1158 ("Confronting a suspect with illegally seized evidence tends to induce a confession by demonstrating the futility of remaining silent.") (citation omitted); *see also* 6 Lafave, *supra*, § 11.4(c), at 401 ("the realization that the 'cat is out of the bag' plays a significant role in encouraging the suspect to speak.")).

The Government has not brought forth evidence to refute the likelihood that Officer Lebario, in eliciting statements from Brown when questioning him, utilized the firearm illegally seized from Brown's bags and luggage. (*See Shetler*, 665 F.3d at 1158 ("The first … consideration in an illegal search case is that the interrogating officers may confront the suspect, either physically or verbally, with the evidence that has been illegally obtained.")). Nor has the Government produced evidence to demonstrate that Brown's statements were not induced or influenced by the illegal search; indeed, there is every reason to believe that they were. (*Id*. ("A second … consideration in an illegal search case … is that the answers the suspect gives to officials questioning him may be influenced by his knowledge that the officials had already seized certain evidence.")). What is more, footage from Officer Lebario's BWC indicates that

while secured inside the patrol vehicle, Brown witnessed the illegal search of the bags and luggage. (*See* Defendant's Exhibit B, no. 5849 Pt. 1 of 2, at 1:03-20). Witnessing Metro Officers conduct the search that uncovered the firearm could certainly have led Brown to make the inculpatory statements he made to Officer Lebario.

At bottom, the Government failed to provide any evidence that Brown's statements were not the product of the illegal search. Officer Lebario was aware that Brown was an ex-felon for whom possession of a firearm was a crime and that a firearm had been found among Brown's belongings. He questioned Brown about the firearm and, in response, Brown admitted to handling the firearm. Under the circumstances, the Court finds that the search of Brown's luggage and bags led directly to his incriminating statements. Given the direct causal link between the search and the statements and the absence of any applicable exception, the Court concludes Brown's incriminating statements should be suppressed as fruit of the poisonous tree. *See Nora*, 765 F.3d at 1057 ("Because the government bore the burden of proving that the defendant's confession was not 'fruit of the poisonous tree,' the government was required to produce evidence demonstrating that the defendant's answers 'were not induced or influenced by the illegal search.' The government failed to do so." (quoting *Shetler*, 665 F.3d at 1158)); *see also United States v. Vasquez De Reyes*, 149 F.3d 192, 196 (3d Cir. 1998) ("A tangible object is hard evidence, and absent its removal will remain where left until discovered. In contrast, a statement not yet made is, by its very nature, evanescent and ephemeral. Should the conditions under which it was made change, even but a little, there could be no assurance the statement would be the same.")).[4]

---

[4] Officer Lebario read Brown his *Miranda* rights shortly after he arrived on the scene and encountered Brown. The *Miranda* warning, however, preceded the arrest of Brown for the warrant, the improper search incident to arrest, the discovery of the firearm, and Brown's incriminating statements. Because the *Miranda* warning occurred well before the search and the incriminating statements, it could not have broken the causal chain between the search and the statements. Even so, such a warning is insufficient to "purge the taint of a temporally proximate prior illegal" act. (*See Shetler*, 665 F.3d at 1159-60; 6 Lafave, *supra*, § 11.4(c), at 402 ("it is crystal clear that giving the defendant … Miranda warnings will not break the causal chain between an illegal search and a subsequent confession.")). As the Supreme Court declared in *Brown v. Illinois*, "[a]ny

24

**B.  Motion to Dismiss or Suppress Evidence (ECF No. 36)**

Brown's Motion asks this Court to dismiss the indictment, or in the alternative, to suppress evidence based on the Government's failure to preserve evidence regarding Brown's arrest and search of his property.  (*See* ECF Nos. 36 at 2; 49 at 8).  Brown argues that the Metro Officers' failure to record, among other things, their initial encounter with Brown, the warrant check, the arrest, and the search of Brown's belongings, in accordance with Metro policies and procedures constituted a bad faith failure to preserve material and potentially exculpatory evidence in violation of Brown's due process rights.  Brown further argues that, even if the Court were to find the Government's conduct falls short of a due process violation, the firearm should be suppressed as a sanction for Metro's failure to create a record of such important evidence.  For the reasons stated below, Brown's Motion to Dismiss or Suppress Evidence should be denied.

**a.  Metro Officers' Failure to Record Portions of Their Encounter With Brown Did Not Violate Brown's Due Process Rights**

The U.S. Supreme Court has not directly addressed the duty to collect evidence.  The Ninth Circuit, however, has held that the Supreme Court's holding and analysis in *Arizona v. Youngblood* applies with equal force to law enforcement's collection of evidence.  (*See Miller v. Vasquez*, 868 F.2d 1116, 1120 (1989)).  Thus, the "failure to collect … evidence that is potentially exculpatory may violate a defendant's due process rights if that failure was motivated by bad faith."  (*See United States v. Martinez-Martinez*, 369 F.3d 1076, 1086 (9th Cir. 2004); *see also Miller*, 868 F.2d at 1120 ("[A] bad faith failure to collect potentially exculpatory evidence would violate the due process clause."); *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to

---

incentive to avoid Fourth Amendment violations would be eviscerated by making [Miranda] warnings, in effect, a 'cure-all,' and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to 'a form of words.'"  (*See Brown*, 422 U.S. at 602-03 (quoting *Mapp v. Ohio*, 367 U.S. 643, 648 (1961))).

preserve potentially useful evidence does not constitute a denial of due process of law.")). In other words, to prevail on claim that the Government failed to collect potentially exculpatory evidence, Brown must show two things. First, Brown must show that the potentially exculpatory evidence was material to his case. Second, he must show that the Government acted in bad faith.

To be material, evidence must (1) "possess an exculpatory value that was apparent before the evidence was destroyed," and (2) was of "such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*See Martinez-Martinez*, 369 F.3d at 1086 (quoting *California v. Trombetta*, 467 U.S. 479, 488-89 (1984))). Bad faith turns on law enforcement's "knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." (*See Youngblood*, 488 U.S. at 56, n.*). Mere negligence or recklessness is not enough; bad faith requires something more akin to "official animus" or a "conscious effort to suppress exculpatory evidence." (*See Trombetta*, 467 U.S. at 488). The burden of proving bad faith falls on the defendant. (*See Youngblood*, 488 U.S. at 56).

The Court finds that Brown has not met his burden of demonstrating that unrecorded portions of Metro's encounter with Brown were material. Brown argues that Metro Officers failed to record their initial encounter with Brown, Officer Rodriguez's warrant check, Brown's arrest, and Officer Robert's search of Brown's bags and luggage. (*See* ECF No. 36 at 5). While Brown acknowledges that "there does not appear to be destruction of evidence," Brown argues that he is left with the same result due to Metro Officers failure to record their encounter by intentionally manipulating their recording devices inconsistent with Metro policy. (*See id.*; *see also* ECF No. 49 at 2).

In contrast to the evidence at issue in *Martinez-Martinez* (failure to collect and preserve blood and urine samples), *Youngblood* (collected, but failed to preserve semen samples from the victim's body and clothing), and *Miller* (failure to collect a blood-stained jacket and photograph victim's scratched arms),

here, the evidence sought was not of "such a nature that [Brown] would be unable to obtain comparable evidence by other reasonably available means."[5]  Stated differently, the evidence sought was of such a nature that Brown would be able to obtain comparable evidence by other reasonably available means.  As the Government points out, that some events from January 29, 2017 were not recorded by BWCs in their entirety does not mean the events did not happen; rather, they have been documented through other means, including an arrest report, declaration of arrest, CAD, voluntary statements, and live-witness testimony.

Besides the Metro Officers, Chittenden and her three friends, witnessed Metro's encounter with Brown.  Chittenden and her three friends were present at the scene throughout the incident.  (*See* Mins. Proceedings (ECF No. 50)).  Chittenden testified at the evidentiary hearing that she observed Metro Officers' search of the bags and luggage, but she did not observe all of the search because she was also speaking with other Metro Officers during this time.  (*Id.*).  Chittenden neither recalled Metro Officers finding a firearm during the search, nor Brown's location in relation to the firearm during that search.  (*Id.*).  Even if Chittenden did not witness all of the events, her three associates who were present on the scene assisting her could have.  Metro Officers Lebario, Roberts, and Rodriguez provided testimony at the evidentiary hearing as to, *inter alia*, the initial encounter with Brown, the warrant check, Brown's arrest, and Brown's location in relation to the bags and luggage next to the stolen vehicle.  (*Id.*).  Indeed, based on the testimony of the Metro Officers, the Court concluded that Brown was handcuffed and locked

---

[5] In *Miller*, the victim informed a police officer that the jacket she had been wearing during the attack had a spot of blood on it, but the police officer did not collect the jacket.  (*See Miller v. Vasquez*, 868 F.2d at 1117).  A few days later, the victim washed the jacket, precluding any test on the blood.  (*Id.*).  In *Martinez-Martinez*, federal agents did not collect blood and urine samples from the defendant when he was detained at the international border at San Ysidro, California for attempting an illegal reentry.  (*See Martinez-Martinez*, 369 F.3d at 1079-81).  The defendant was allegedly a heavy drug user, but did not appear intoxicated at time of his detention.  (*Id.*).  The defendant did not develop outward symptoms until he went into heroin withdrawal later that evening.  (*Id.*).  A government physician's assistant administered prescription medication for heroin withdrawal, but did not take any blood or urine samples.  (*Id.*).  Blood and urine samples could have been collected within 72 hours for accurate drug testing, but defendant was not appointed counsel until a full day after his arrest, and his counsel had no indication that a drug test might be integral to his client's case.  (*Id.*).  In *Miller* and *Martinez-Martinez*, the evidence sought was of such a nature that it was not reasonably available to the defendant.

in the back of a patrol vehicle at the time of the arrest and search, rendering the search incident to arrest unconstitutional. This undermines Brown's argument that he could not obtain comparable evidence from other sources. At bottom, the Court's inquiry is whether the evidence sought was of "such a nature that [Brown] would be unable to obtain comparable evidence by other reasonably available means." The evidence sought, *e.g.*, Brown's demeanor when Metro Officers first arrived or the proximity of Brown in relation to the firearm at the time of the arrest and search, is of such a "nature" that Brown would be able to obtain comparable evidence by other reasonably available means.

In addition, Brown has not met his burden to show that the evidence possessed an exculpatory value that was apparent before it was "destroyed." Brown argues that his initial encounter with Metro had the potential to be exculpatory because Officers could have recorded his location vis-a-vie the firearm and his demeanor when they first encountered him. Brown also asserts that he made statements that are not captured on the recordings.

To meet the definition of materiality, the evidence must have possessed an exculpatory value that was "apparent" before the evidence was "destroyed." (*See Martinez-Martinez*, 369 F.3d at 1087). The evidence Brown alleges Metro failed to collect was neither. First, no evidence was destroyed; it simply did not exist in the first place. Under Ninth Circuit precedent, the "failure to collect potentially useful evidence is distinctly different than a destruction of evidence that is already extant." (*See id.*; *see also State v. Krosch*, 642 N.W.2d 713, 718 (Minn. 2002) (noting that "[t]here is a fundamental distinction between those cases in which the [Government] loses, destroys, or otherwise fails to preserve evidence it has collected and those in which the [Government] fails to collect evidence in the first instance" and that "it would be illogical to impose an obligation on the [Government] to preserve evidence that it does not possess.")). Brown acknowledges that "there does not appear to be destruction of evidence." (*See* ECF

No. 36 at 5). Absent such body camera recordings of portions of Metro's encounter with Brown, there was no existing evidence for Metro to destroy.

Second, the Court is not persuaded that it was readily apparent that BWC footage might have proven exculpatory at the time. Indeed, the BWC may have incriminated Brown further. (*See Martinez-Martinez*, 369 F.3d 1076, 1087). This prospect may be bolstered through other evidence, including witness testimony, arrest report, witness statements, and photographs. To be sure, BWC recordings of, among other things, Brown's location vis-a-vie the firearm, his demeanor when Metro first encountered him, and his statements, might have been exculpatory. But that does not render it per se "material." The evidence must have possessed an exculpatory value that was "apparent" <u>before</u> the evidence was "destroyed." Brown fails to meaningfully argue whether the BWC recordings of his location, demeanor, or statements possessed an exculpatory value that was apparent to Metro Officers before it was "destroyed." Brown has not overcome his preliminary hurdle of demonstrating that relevant BWC footage was material to his defense.

Even if the Court were to find in Brown's favor on materiality, Brown has failed to show bad faith. Brown argues that the disjointed nature of the BWC recordings was not by accident or forgetfulness. (*See* ECF Nos. 36 at 6; 49 at 5). Rather, Brown asserts that Metro Officers' intentional, and improper manipulation of their BWCs shows bad faith.

The argument that the mere fact that the Government did not collect the evidence shows bad faith is untenable. Nothing under 18 U.S.C. § 922(g)(1) requires the Government to prove its case through direct—as opposed to circumstantial—evidence. If there are weaknesses in the Government's case that create a reasonable doubt as to Brown's guilt, then Brown's attorneys may identify these weaknesses on cross-examination and during the presentation of his case.

Brown also directs the Court to Metro's policies and procedures on wearing BWCs and argues that the Officers' failure to follow those policies and procedures shows bad faith. (*See* ECF No. 49-1). At the evidentiary hearing, Officers Lebario, Roberts, and Rodriguez testified that they were required to wear BWCs, and as a result, "follow LVMPD's procedures as to when they were required to turn off and on the device once the officer decided to wear" the BWC. (*See* Mins. Proceedings (ECF No. 50); *see also* ECF No. 49 at 5). Each Officer testified that they had received training on operating the BWC—a one-time 3-hour presentation. (*Id.*). Each read Metro's 12-page policies and procedures document on wearing BWCs, but received no specific training or guidance on those policies. (*Id.*).

Brown argues that despite the Metro policies and procedures and the Metro Officers' training, they failed to abide by those policies and procedures. (*See* ECF No. 49 at 5). Officers Lebario, Roberts, and Rodriguez all wore BWCs on January 29, 2017 and had activated their BWCs at various points throughout the evening. For example, Officers Roberts and Rodriguez both activated their BWCs when they were dispatched to the scene as required by Metro policy. Officer Lebario did not immediately activate his BWC when he was called to the scene, but did activate it shortly after he encountered Brown. At one point, Metro Officers switched off their BWCs to discuss "investigative information," but failed to promptly turn it back on. After discussing investigative information, Officer Roberts conducted a search incident to arrest of Browns belongings which led to the discovery of the firearm. Yet because he did not re-activate his BWC, there was no recording of his search and discovery of the firearm. Brown argues that there was no justification for Officer Roberts's failure to turn back on his BWC after his conversation. Indeed, each Officer, when pressed by Defendant's Counsel on cross examination, acknowledged that they did not activate their BWCs at the appropriate times in accordance with Metro policies and procedures. (*See* Mins. Proceedings (ECF No. 50)).

Brown argues that the failure of a single officer to capture Brown's initial encounter, his detention, the warrant check, his arrest or the search incident to arrest, smacks of bad faith. (*See* ECF No. 49 at 5-6; *but see* Howard M. Wasserman, *Moral Panics and Body Cameras*, 92 Wash. U. L. Rev. 831, 833 (2015) ("While body cameras are a good idea and police departments should be encouraged and supported in using them, it is nevertheless important not to see them as a magic bullet.")). The Court agrees that Metro Officers Lebario, Roberts, and Rodriguez did not activate or re-activate their BWCs in strict accordance with Metro policies and procedures. Even so, this is more indicative of negligence than bad faith. The Court has thoroughly reviewed the footage from the BWCs and testimony from the evidentiary hearing, and finds that the Government's conduct does not rise to the level of bad faith. "Official animus" or a "conscious effort to suppress exculpatory evidence" are lacking here.

As the Government persuasively argues, "body cameras are new devices that officers … are still getting acclimated to using" because they are "not yet accustomed to having all of their discussions permanently memorialized." (*See* ECF No. 45 at 5). Officer Lebario testified that he has nearly two decades of experience as an Officer; Officer Roberts testified that he has about 11 years of law enforcement experience. (*See* Mins. Proceedings (ECF No. 50)). As of January 29, 2017, the latter had been using his BWC for 3 days, while the former had been using his for 2-3 weeks. (*Id.*). Officer Rodriguez testified that he had been working as an Officer in training for 3 months as of January 29, 2017, and had been using a BWC during this time. (*Id.*). To infer bad faith from Officers—who have been policing the streets for over a decade—to perfectly comply with Metro policy on a new and disruptive technology like BWCs would be unreasonable. Brown argues that the BWCs had been in use in the department for about 3 years since 2014. This does not contradict that the BWCs were still a new technology in the throes of wide-scale implementation.

As BWCs become more pervasive, and their use more ingrained in the culture and day-to-day routines of police officers, the Court cannot say that the absence of video evidence in violation of internal police procedures can never be suspicious or suggestive of misconduct. But the record, at this point, does not support Brown's contention that the Metro Officers' intentionally manipulated their body cameras for the specific purpose of prejudicing Brown. Here, there is no evidence which, even construed in the most favorable light, would suggest that Metro Officers who arrested Brown and searched his belongings incident to the arrest, acted in bad faith. At most, the record reflects negligence in failing to turn on the BWCs. And negligence is not enough. Brown has failed to cite a single case where a Court has found bad faith from the failure of law enforcement to record certain events with their BWCs. Having failed to demonstrate either the materiality of the evidence or any bad faith on the part of the Government, Brown cannot make out a due process violation based on the failure to collect BWC footage at certain junctures of Metro's encounter with Brown.

### b. Metro Officers' Failure to Record Their Encounter With Brown Does Not Justify Sanctions

Even if the Government's conduct falls short of a due process violation, Brown argues the Court should sanction the Government for its failure to create a record of such important evidence. (*See* ECF Nos. 36 at 6-7; 49 at 7-8).

Brown relies on *United States v. Flyer*, 633 F.3d 911 (9th Cir. 2011) for the proposition that this Court should sanction Metro Officers' conduct short of finding a due process violation. (*See* ECF Nos. 36 at 6-7; 49 at 7-8). *Flyer* involved the prosecution of a defendant for, *inter alia*, possessing child pornography. (*See Flyer*, 633 F.3d at 913). In *Flyer*, an FBI agent mishandled the defendant's laptop, resulting in the loss of evidence. (*Id*. at 914-15). Based on the FBI's mishandling of the defendant's laptop, the defendant brought a motion to dismiss on due process grounds and to suppress evidence. (*Id*.

at 915).   Relying on *Arizona v. Youngblood*, the Court in *Flyer* found no due process violation because the evidence showed that the FBI agent did not intentionally corrupt data on the laptop, but rather mishandled it.  (*See Flyer*, 633 F.3d at 916).

With respect to the defendant's motion to suppress, the Ninth Circuit held that "[i]f the government destroys evidence under circumstances that do not violate a defendant's constitutional rights, the court may still impose sanctions including suppression of secondary evidence."  (*Id*. (citation omitted)).  In so doing, the Ninth Circuit held that courts must balance "the quality of the Government's conduct and the degree of prejudice to the accused."  (*Id*. (citation omitted)).  "The Government bears the burden of justifying its conduct and the defendant bears the burden of demonstrating prejudice."  (*Id*. (citation omitted)).  The Ninth Circuit affirmed the district court's denial of the defendant's suppression motion because there was no clear error in the district court's determination that the government's conduct did not indicate bad faith and the defendant did not show that the FBI's mishandling of the evidence prejudiced his defense.  (*Id*.).

The Court is not persuaded that the failure to activate the BWCs supports the imposition of sanctions pursuant to *U.S. v. Flyer* as Brown argues here.  *Flyer* involved the failure to preserve evidence; not the failure to collect evidence.  The difference between the two is significant.  (*See Martinez-Martinez*, 369 F.3d at 1087 ("A failure to collect potentially useful evidence is distinctly different than a destruction of evidence that is already extant.")).  In *Flyer*, the Ninth Circuit relied on *Youngblood*, a U.S. Supreme Court case, and *United States v. Loud Hawk*, a Ninth Circuit case, for its holding which specifically involved the destruction of evidence.  (*See Flyer*, 633 F.3d at 916).  The *Flyer* court never explicitly or implicitly addressed the failure by law enforcement to collect evidence.  Indeed, the Ninth Circuit in *Flyer* did not reference its prior holdings in *Martinez-Martinez* and *Miller*, both of which did touch upon the

failure to collect evidence. And upon finding no due process violation, the Ninth Circuit in *Martinez-Martinez* did not address sanctions as an alternative for the failure to collect evidence.

Brown argues that *Miller* extends due process protections when law enforcement fails to collect potentially exculpatory evidence in bad faith. (*See* ECF No. 49 at 7). Because the Ninth Circuit allows for a dismissal in such circumstances, Brown asserts, that courts can also sanction the Government when warranted pursuant to *Flyer*. (*Id*.). While Brown correctly states the holding of *Miller*, he does not provide substantive support for this Court to find that the failure to collect evidence could ground a claim for sanctions under *Flyer*. In particular, Brown fails to direct the Court to any case in the Ninth Circuit that has made such a finding. Nor has this Court's review of case law in this Circuit and others unearthed authority standing for the proposition Brown puts forth.

Balancing "the quality of the Government's conduct and the degree of prejudice to" Brown under *Flyer*, suppression of the firearm is not warranted. As explained earlier, at most, the Government's conduct evidenced negligence, not bad faith. The Government did not destroy any evidence. On the other side of the scale, Brown has not shown that Metro Officers' failure to record the entirety of their encounter in accordance with Metro policy prejudiced Brown's defense. Brown argues that the lack of a contemporaneous record prejudiced him. (*See* ECF No. 36 at 7). In particular, Brown maintains that he will suffer prejudice "with respect to his ability to challenge his possession of the firearm by arguing … that his demeanor when the officer first encountered him may indicate that he did not possess the firearm." (*Id*.). In addition, Brown claims that he will suffer prejudice by the failure to record statements he made initially and the statements where there is video but not audio. (*Id*.). But Brown ignores the quality of the available substitute evidence, namely eye witness testimony from Chittenden, Chittenden's friends, or

Metro Officers. The prejudice to Brown is minimal. Brown's request for suppression of the firearm is denied.[6]

ACCORDINGLY,

IT IS HEREBY RECOMMENDED that Defendant Justin Brown's Motion to Suppress Evidence Due to Fourth Amendment Violations (ECF No. 20) be GRANTED in part and DENIED in part.

IT IS FURTHER RECOMMENDED that evidence of Brown's incriminating statements about the firearm be SUPPRESSED from the Government's case in chief.

IT IS HEREBY RECOMMENDED that Brown's Motion to Dismiss or Suppress Evidence (ECF No. 36) be DENIED.

IT IS SO RECOMMENDED.

DATED this 14th day of August, 2017.

_____
CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE

---

[6] Fed. R. Crim. P. 16(a)(1)(A) states: "Upon a defendant's request, the government must disclose to the defendant the substance of any relevant oral statement made by the defendant, before or after arrest, in response to interrogation by a person the defendant knew was a government agent if the government intends to use the statement at trial." Brown argues that the Government should be sanctioned for failing to comply with Fed. R. Crim. P. 16(a)(1)(A) because Metro Officers manipulated the BWCs causing a gap in recording Brown's statement. (*But see United States v. Zaragoza-Moreira*, 780 F.3d 971, 981 (9th Cir. 2015) ("[N]on-compliance with Rule 16 does not amount to a due process violation absent bad faith ….")). Brown directs the Court to a particular body camera video file where, although the body camera was turned on and there was video footage, over 30 seconds elapsed without audio, thus preventing Metro Officers from capturing his entire statement. (*See* ECF No. 49 at 8). The Government notes that the substance of the unrecorded portion has been disclosed through police reports. (See ECF No. 45 at 7). Brown does not dispute this. Further, the Government points out that the "only audio recording or transcript of the interview in the government's possession is what the video includes, which has been disclosed to the defense." (*Id.*). Brown's argument lacks merit because the government cannot disclose things that it does not actually have.